Alright, the United States Court of Appeals for the Federal Circuit is now open in its session. God Save the United States and its Honorable Court. Good morning, you may have a seat. We have a total of four cases today. Two cases are submitted on the brief and we have two cases for oral argument. Our first case is N. Ray Armadafinil, Patent Litigation, Numbers 2013-1360-1361 and 1364-1371, a consolidation of a number of cases. Mr. Hurst, I understand you will be leading the argument. You may proceed, sir. Good morning, Your Honors. Jim Hurst, may it please the Court, I'm arguing on behalf of all of the appellants. First principles prove the invalidity of Cephalon's patent on Form 1, the crystal. And that's because under KSR, advances that occur in the ordinary course without real innovation are legally obvious and that's what we have here. There's a key piece of prior art, it's the 855 patent from way back in 1990 and it teaches three key things. First, it teaches that if you take Armadafinil and you recrystallize it in a specific solvent, ethanol, you're going to get white crystals. That's what it teaches. That's Preparation 1. Two, it teaches you can take Preparation 1 and put it in a pharmaceutical composition to treat sleep disorders. Number three, it teaches that they successfully use that pharmaceutical composition in human clinical trials to actually treat successfully sleep disorders and the patent says it is a particularly valuable compound in that regard. Can I ask you this? Sure. Suppose that I thought that the district judge focused in part incorrectly on expectations of achieving the particular structure that is Form 1, which rather than focus on whether there was a motivation to take the steps that in fact would lead there and then it could be characterized through x-ray diffraction. Where do I go with that conclusion? Is that a basis for a remand for fact finding on the right motivation question? I don't think so, Your Honor. I think you can take that and you can rule as a matter of law that the patent is invalid and here's why we do think the district court focused on the wrong thing, whether or not the XRPD pattern was predictable. It is beyond dispute. It is no longer contested on this appeal that the 855 patent created a motivation for one, of skill in the art, two, run the experiments that would be necessary to find the most stable readily available. There's one fact I'd like you to address, which at least potentially looms large, which you address I think in one half sentence in your gray brief. The fact that for 10 years evidently the motivation was insufficient for people to do that. Now you say something, I think the only thing you say about that is that you were forbidden to use it during that time, which I don't understand how that squares with 271E, was it 1 or 2, whatever the Merck Integra provision is that allows research use reasonably related to a potential FDA application among others. So why isn't at least potentially the sheer fact that for 10 years nobody actually was sufficiently motivated to go and do this a significant fact? Two points. First, in reality Cephalon created Form 1 immediately. So they did it back in 1990 and then they shelved it and didn't file for a patent application until 2003. So factually it happened right away. So that shows you the motivation existed. Number two, they had a patent on this compound and they didn't actually have an NDA approved application. There was no motivation for anybody to work with this compound until the time came when you could start actually filing N's in a reasonable way. That's what I guess in part I don't understand. I suppose there was some chance somebody would have said this is not patentable because it's obvious, but there was evidently some chance that the BTO would say no, this is patentable. So why wasn't it in somebody else's interest either to go and do a new drug application, perhaps they would have been barred by the dominant patent from actually marketing it, but that's real economic value you can negotiate about with the dominant patent owner. I think you're incorrect about that, Your Honor, because there was a patent on armadacinil that prevented anybody from working with it in any form. But that's what I asked you about, about the Merck Integra 271E2. Just explain to me. Sure, sure. It seems to me if you're thinking about filing an FDA application, you're allowed to work with it. It's the way the regulations work. Okay, first when somebody gets an NDA application on file, there's a regulate and they actually get approval and that's Cephalon. They actually get regulatory exclusivity for a period of time. So nobody can patent or no patent, nobody can sell a generic form of it. Can they experiment with it though? They can, but only when it makes sense, right? You're not going to start working, if you're not going to be allowed to get on the marketplace and say I don't have the dates at hand because this wasn't an issue that was addressed, if you're not going to be allowed to get on the marketplace until say 2005 no matter what, because of regulatory exclusivity, there's literally no incentive to start working back in 1990, 1995, 2000, whenever the date is that the regulatory exclusivity expired, that's when it started to make sense to start moving forward. And not until then, because of regulatory exclusivity and patent protection on the armadacinil molecule itself. We know that Form 1 actually is something produced in the ordinary course and we know that because back in the prior art, in 2003... Let me just take you back for a second to what you said. Is there a time period where there's a zone prior to utilization under the patent and yet under the regs you're permitted to experiment with it? Is there some kind of gap there? You can actually start your experimentation early because there's nothing stopping you from doing it, but there's no motivation to do so because the patent on armadacinil itself and the regulatory exclusivity keeps you off the marketplace. But I just do want to point out, the one thing that you say about this seems to me, on page 21 of your reply brief, says you were blocked from working with it. I think we've just come to the point where you now agree that that's just not correct. You might not have had enough of an economic motivation, but you were not legally blocked from researching with the armadacinil itself. For all practical purposes, Your Honor, when there's a patent on armadacinil, yes, you could start under the safe harbor to start working and maybe people did and we wouldn't know whether they got Form 1 immediately or not because it wouldn't be something that would be public, number one. But for all practical purposes, when there's a blocking patent, there's no incentive to start doing the work until that blocking patent moves out of the way. We challenged the crystal patent. We didn't challenge the blocking patent on armadacinil itself. So we never did that. We only challenged the crystal patent. But look at the prior art too. By 2003 or 2002. Is there any precedent from our court that claims polymorphic forms of known crystals or is this just a case of first impression? This, I believe, is a case of first impression in the following way. There has been no case like this before where the prior art literally says, recrystallize in ethanol and you're going to get white crystals, and then somebody comes along and says, I should have a patent on the particular form based on my measurement of XRPD. That has never happened before. That has never happened before. There are some older cases, long before KSR, which deal with situations where the prior art didn't actually teach that the compound could be produced as a crystal. So this is unique, first impression, and certainly the first post-KSR case to deal with this. Conventional techniques in 2003 were unquestionable. You're arguing that finding the patent non-obvious would render patentable all polymorphic forms of structures. Yes, in ways that really can't be defended as a practical matter, Your Honor. Right now today, for instance, there are these high-throughput methods to create crystals in large quantities, and you just try every variation. Under the district court's reasoning, it's routine. It's automated. Under the district court's reasoning, each crystal that gets spit out of this throughput situation is a separately patentable invention because you can't predict the XRPD pattern in advance, and that's just not logical. What's the percentage of time that you come up with Form 1? Oh, it's 90%. Is it 90%? Yes. So what they did, look, nobody disputes that conventional techniques will produce Form 1, especially if you use ethanol as taught by the prior art. Our experts did it seven out of seven times. Cephalon used the prior art technique. They admit it's typical benchtop screening, and they got it 90% of the time, 30 out of 34 times. That's KSR. Will the invention produce itself in the ordinary course without innovation? That's what happens. 90% of the time practicing the prior art, you produce Form 1, and the district court really did just ask the wrong question. The district court said, was it predictable to come up with the inherent properties of Form 1, When I read the district court's opinion and started thinking about it and then went back to look at it, it seemed to me that some of the things the district court said in findings were not dependent on the notion that what needed to be motivated and predictable was a particular structure with a particular x-ray diffraction pattern. But some of them were, and they all seemed kind of intermixed. So I was left thinking, I'm not quite sure what the finding of motivation would have been without the unduly particularized focus. Well, I think the motivation is no longer even contested. Everyone's agreeing now that the 855 patent created a motivation to find and obtain the most stable, readily available crystal. So that's no longer on the table as far as I'm concerned. But to your point, when I read through the opinion, you're right. Sometimes the district court says expressly structure, you needed to predict structure. Sometimes the court just says it wasn't predictable to get Form 1. He means the same thing in both instances. Because when he just says Form 1, he has already defined Form 1 as the particular crystal with that particular structure. So it seems to me that the only fair reading of this opinion is that the entire foundation was you had to predict an XRPD pattern which Pfizer, Moderna, Cuban, Asterisk, Titanium. What they all tell you is an obvious step doesn't suddenly become patentable because you measure an inherent property. That's just not sensible. What is it about the disclosure of ethanol in the crystallization process that what's its role leading to Form 1. Different solvents will sometimes produce different crystals and ethanol is particularly good at producing Form 1. Does the prior art disclose that it's going to lead you to Form 1? What the prior art discloses is that if you use ethanol, you're going to get white crystals and 90% of the time, 30 out of 34 times, you're going to get Form 1. Is it really 90 or is it higher? Based on the record, Your Honor, it's 90. Well, it could be higher if you took – it's 90. It's in that neighborhood. At the time that the patent was issued, was it known in the art that the crystallization process with the use of ethanol would lead to 90% Form 1? No. That's part of the routine conventional experimentation that people would do from the patent. And so if in the ordinary course, you follow up on the patent and you get Form 1. Well, why would you be motivated then to even get to that? I mean, you can achieve many different types of structures through crystallization. Because the FDA taught in 1987, they started to require you to ensure that you had the most stable crystal. It's conventional that you have to use the most stable crystal for a pharmaceutical formulation because if you don't, during manufacturing or storage, it could convert to something else. Okay, you're into your rebuttal time. I will reserve the rest of my time for rebuttal. Okay, we'll put you back to 30 minutes because we took you over the rebuttal. Thank you, Your Honor. All right. Mr. Lipsy? Thank you. Good morning. It may please the Court. Aside from the detailed findings of the trial court, there are four inconvenient truths that stand in the way of the grand policy argument that appellants want to make. The first- Well, Mr. Lipsy, let me ask you what looks to me like an inconvenient truth for you, and that is that where your opposing counsel closed on the FDA guideline from 1987, it says, it uses the word should, appropriate analytical procedure should be used to determine whether polymorphism occurs. How do you reconcile that 1987 guideline with your position about unpredictability of polymorphism? The same issue arose in the Abbott v. Sandoz case. There was an FDA guidance that said what the properties ought to be of an extended release formula, and the court there said that identified the goal. It didn't identify the means of achieving it, and that's exactly the same problem here. Those guidelines came out in 1987, and if it followed as night follows day from doing what the FDA says would be nice, you always found the most stable form. You would never see tobaccos like the Rotonavir situation where they didn't find the most stable form, and you wouldn't see the situations referred to in the Gardner and SEMA publication from 2004 where it says almost every company can refer in its history to unexpected and undesirable results. Well, if it's not night follows day, in excess of 90% seems to me to be pretty predictable. And that is where the court has been led astray. Any legitimate analysis of obviousness ends where the invention begins. The statute specifically says... With white crystals. Which, in fact, at least 9 out of 10 times are Form 1. Not so. Not so, and the trial court specifically found that, and that's the second inconvenient truth. The first one is the claim it's not just a Form 1, it's a pharmaceutical composition consisting essentially of it. The second is the trial court specifically found in pages 832 to 41, that the product of 855 Preparation 1 was not Form 1. And the analysis there is quite compelling. The evidence showed that the instantaneous melting point of Form 1 was from 159 to 164 degrees, and the instantaneous melting point for Preparation 1 is actually reported there, and it was 153 to 154, much closer to Form 2. And that shows that you don't get Form 1 as night follows day. That, in fact, the very first time that process was conducted, you got something else. Those findings are not clearly erroneous. And frankly, there was no indication on the face of that patent to do anything else. Did your testing in fact show 90%? The work that the inventors and the patent owner did in developing the invention all, none of which is prior art, did show that a large number of conditions can be used to prepare Form 1, as well as two other forms that appear, and I believe the word was frequently, although not nearly as much as Form 1. That, your honor, unfortunately, is using what the inventor discovered against him to establish obviousness. And there are indeed authorities in this area. One of them is from the International Trade Commission. Well, it's not exactly. It's using what the inventor disclosed, which is a solvent, right, and a result, the white crystal, and looking at it and saying what that solvent produces in that white crystal is, in fact, Form 1. It is not. That's exactly what the trial court found. What came out of Preparation 1, as described in that patent, was not Form 1. Now, if you went to go look to see, to do the research project, to see whether there was polymorphism, which was not predictable at the time, and if so, what those structures could be made might be, which was not predictable at the time, and if so, how they could be made, which was not predictable, and if so, what their properties were, which was not predictable. If you did all that research, that was the research project that led to the discovery of Form 1. But is predictability the true test here? Shouldn't we be looking at whether there was a reasonable expectation of success, especially given the fact that evidence of secondary considerations were excluded in the case? Agreed. A reasonable expectation of success from the prior art. The prior art stopped when the inventive acts began, and even the Supreme Court says predictability is a factor. Wouldn't one skill in the art know to have motivation to further the crystallization process? Because that process was pretty well known in the art, and the prior art disclosed that the use of ethanol would aid in the crystallization process. As the evidence showed and as the trial court found, there are a huge number of variables beyond saying ethanol that affect the crystallization. There are different grades of ethanol. It is the absolute ethanol done in dilute concentrations with slow cooling that gives you Form 1. That was in our patent, and indeed when they went to duplicate the example of not our patent, but the prior art, those were the conditions they used, and the only conditions they used. The factors are grade of ethanol, cooling rate, and temperature, right? Grade, cooling rate, impurities, particularly impurities, which can have a great effect on what you get in a crystallization, and that's throughout the district court opinion if you take a look through there. All of those parameters, starting temperature, ending temperature, solvent choice, solvent concentration, impurities, all of those have an effect, and indeed they were characterized by both sides. Dr. Bernstein in his 2002 book said there is a vast variety of conditions that can affect the crystallization, and for any polymorphic system it is indeed difficult to single out a particular factor that might dominate. Dr. Seema also in 2002, because many variables influence crystallization, and because so many reagents and processes are available, testing is an extremely tedious process, and industry does not have the time or resources to test hundreds of thousands of combinations to achieve an optimized product. That was the state of the art. There were a vast array of conditions that were known to affect the crystallization, and indeed we cited a Seema article, I think it was Peterson and Seema in our brief, that sometimes even with identical conditions you can get... So it's an amazing coincidence that 30 out of 34 times you came up with Form I. That was the invention, Your Honor. That was what the inventors found that was entirely unknown and unpredictable from the prior art. And as I said, you know, the ITC case of the in-ray certain cephedroxyl crystalline material dealt with this issue and concluded that the inability of the prior art to predict the structure of the crystal was fatal to the obvious contention there. That's been the law. That's a standard application of garden variety pharmaceutical patent law. Can you put aside cases? I realize that's putting aside a lot. Explain why it makes sense if the following facts are true here. Why does it make sense if the prior art says here is a process, somebody who would run the process with some number of possible variations of details, I don't know what the number would be, and it turns out that they would almost always get this particular structure. And suppose they're sufficiently motivated to do that by a desire for stability. You might not always want the most stable, but you would want to see what the more stable thing is. Why in the world would there be a patent for that when it seems awfully likely that the world would produce it without a patent? The problem with that analysis is that it is forbidden by 35 U.S.C. 103a last sentence. Patentability shall not be negative by the manner in which it was made. And if you back away from that, what the court was proposing is that patents would be awarded to the inept, the inefficient, or the unlucky who dither for weeks and months before finding something and denied to the adept, efficient, and lucky who happened perhaps to find it quickly. That you cannot use what the inventor found out as if it were in the prior art. Now, stepping back also on a policy matter, there is a flip side to this unpredictability, which means there's no free lunch under the patent law here, and that is, as the patent office has noted in that slide presentation that was cited in Lupin's brief, because of the unpredictability, it is highly unlikely that a generic claim can possibly issue. These claims, because it's so unpredictable, are very, very narrow, directed to the very specific product they get, and for that reason are usually easily avoided. And in this case, the defendants have chosen not to do that. So how do you practice a prior art of crystallizing without running into the 90 percentile each time you do that? It seems to me that if you practice a prior art and you use ethanol in the crystallization process, that 90 percent of the time you're going to end up with Form I. How do you avoid that? See, you're arguing that Form I has to exist in the mixture to begin with. What I'm saying is that Form I did not exist in the prior art, in PrEP I, in the trial courts. But your arguments about predictability almost make it certain that Form I has to exist within the mixture in order to achieve Form I through the crystallization process. Not so at all, Your Honor. When a person of ordinary skill in the art, looking at that disclosure, has no idea if there even are polymorphic forms, and no idea how to make them or what they're going to be, and certainly no idea of which one would be stable enough. Well, it's well known in the art that if you take the compound and you go through further crystallization, that you're either going to end up with one form, a morphic or a unimorphic, or you're going to have polymorphic structures. Not necessarily. You could do that experiment 55 times and not see any different form, and you could do it the 56th time and get a different one. In point of fact, when you look at the work that Hollingsworth did here, he did four runs. In one of them, he went to purify the material in ethanol, happened to use a slightly higher concentration, and what did he get? He got something that was 90% Form II. That is not the invention. The course has to look at the evidence and make an evidence-based determination here of what the capabilities of the person of ordinary skill in the art were, and that person did not know what to do, what range of conditions were going to be determinative, what range of solvents were going to be determinative, what was going to be required to make polymorphic materials, which, by the way, are made. They are not naturally occurring, and it is that degree of unpredictability which made what these inventors found when they stepped into the crystallographic unknown unobvious, and there is no decision that this court will find looking back where a court has found a man-made new crystal form identified by structure that was not predictable to have been obvious. How could a person skilled in the art post-1987, post the motivation from the government, given the identification of the solvent within the pattern, not have known to take the steps required to crystallize? It depends on which, if you simply do what is in that example, the example tells you you get something else. You get those white crystals with an instantaneous melting point of 153 and 154. That is what you get. Maybe there are other things you can do. Maybe there are other things you can do, other solvents, other conditions, other temperatures. Maybe you can get something else. That is what research is, and the outcome of that was notoriously unpredictable at the time this invention was made. There may come a day when it is more predictable. This science is exploding, and as in the case of molecular biology within Red Cuban where we saw the art develop to the point where things that were not predictable became predictable, that day may come. That day had not come at the time of this invention. I am going to ask you again, because I do not believe you answered my question. How does one practice the prior art, crystallization with ethanol, without 90% of the time ending up with Form I? All it says is ethanol. It does not tell you which grade. It does not tell you what temperature. If you use denatured ethanol, you get Form II all of the time. It is a question of doing a research project to try to find out what range of possible crystalline structures exist and what their properties are, and when you find one, it cannot legitimately be said. You seem to be avoiding the evidence in the record that if you use ethanol in the crystallization process, you are going to end up with polymorphic structures that if they undergo further crystallization, you are going to end up with this compound 90% of the time. If you undergo further crystallizations with specific solvents, that is true. If you undergo further crystallizations with denatured ethanol, that is not true. Nobody knew whether it was polymorphic, and if so, what alterations had to be made in order to create these polymorphs and if so, what their properties would be. How did the persons conducting your client's experiments decide what form of solvent to use? The record reflects that what happens here is what often happens. Nobody knew there was a problem. They were developing the product. All of a sudden, there started to be different properties in the lots they were looking at. Couldn't figure out what was going on. They did a research study, and the inventor used his intuition and insight and selected a collection of solvents to use and did the experiment. How many different solvents did he use? I think there were maybe 10 or 12 is my recollection, but that, Your Honor, is forbidden to interpret. It seems to me, Counselor, that your arguments are that the prior art, you've given it a really broad disclosure, and it's hard for me to understand how you can practice any crystallization, given that disclosure, that you can practice any crystallization process without infringing. Well, keep in mind, the patent is not on the process, and the obviousness of the process of searching for these things is not at issue, and you only infringe this patent when you make a pharmaceutical composition consisting essentially of this specific form. The prior art, which I think we've cited in our brief, indicates that there's a dozen or more different polymorphic forms, and I guess to the point- So does the prior art claim all polymorphic forms that are achieved through the crystallization process? No. Oh, I'm sorry. The prior art claims the molecule. It does not specify any particular form. It can be in a liquid, it can be an amorphous product, it can be white crystals, it can be anything. That's what the prior art- But does it claim any polymorphic forms that result in crystallization of that molecule? It does not. The prior art does not claim any polymorphic forms. It's a dominant patent. It is a patent on the arrangement of the atoms in the molecule, not the atoms in space. Just quickly, if I may, I realize my time is going short. Go ahead and wind up. On the motivation point, we do have in the record an A17898 patent application filed by a generic drug manufacturer in 2007, right in the face of all of this, with exploring a whole variety of different polymorphic forms of armadafinil. And, indeed, even though it takes 10 years for the March for the brand-name pharmaceutical company to get to market, that investment is worth making for us,  Okay, thank you. Thank you very much. Mr. Hurst, I'm going to give you an additional minute to your time. So you have four minutes. Thank you, Your Honor. Let me start by supplying some dates that I didn't have for you, Judge Taranto. The NDA was approved in 2005. The exclusivity, the data exclusivity for that NDA expired in 2010, which means that no ANDA could be filed before 2010, which sort of saps the practical incentive to do anything with this drug because you can't file any time before 2010. So maybe two, three years before then you might start looking at it, but not before that as a practical matter. Second, Mr. Lipsy just identified the A55 patent as the dominating patent. It covers all crystal forms because it's not specific. It covers armadafinil, so it covers everything. It did not expire until 2010. So, really, there was no incentive for people to start working on this project until a year, two, three years before 2010. Next, I didn't talk about the LNP case, but it does address one of the points that Mr. Lipsy was making. In the LNP case, what the court held, and this is not just that one case, but it crystallizes the principle. If a product… You had to say that didn't you? I've been saying that in prep and people have told me not to and I accidentally just did it. The LNP case says that if the product is the result of the normal operation of a prior art process, then that product is invalid. You can't get a patent on it. And so the question that we have is, what's the normal operation of the prior art process where they say, crystallize out of ethanol, this A55 patent from 1990, where they don't specify particular parameters like concentration and cooling rate and temperature. Do you know what the normal operation is? To vary those parameters, to vary those parameters. It's routine. You vary concentration, temperature, and cooling rate, and 90% of the time you will get Form 1. Under LNP, that means this patent is invalid. Do you mean by concentration something different from what Mr. Lipsy referred to when he talked about the grade? The ethanol grade can make a difference as well. The patent doesn't tell you which ethanol grade to use. Presumptively, it's absolute ethanol, and absolute ethanol will produce Form 1 a vast majority of the time. Any ethanol grade will really get you there until you start using mixtures. So the experimentation in the record showed that if you actually use ethanol with other kinds of solvents and you mix them up, you can start moving away from Form 1. But the prior art only discloses ethanol. Only ethanol. It's all disclosed. Okay. Right. So one of the things I wanted to address is Mr. Lipsy said, you cannot look at the inventor's work. You can't look at their experimentation. But the reason that's incorrect is because it really doesn't matter who did the experimentation. It could have been our experts, we reproduced it seven times, or a third-party company. The reason we're relying on this experimentation is because it is a reproduction of the prior art. Cephalon admitted, they said, you know what we did? We did, they called it a typical screening. A typical screening. So they're saying to you, I'm doing the prior art. I'm practicing the prior art. And so whether Cephalon did the work, whether we did the work, it doesn't matter who did the work, it teaches you that practicing the prior art will get you Form 1 90% of the time, and that, under LNP, renders the claims to the Form 1 crystal invalid. Can I ask you just one question? We haven't talked about this, but there's a little claim construction dispute here. Did you identify anything in the prior art that would be within the broader construction that you promote that is outside the narrower construction? It actually, no, not in the prior art, but it does address one of the district court's concerns. What the district court was concerned with when you addressed the claim to putting Form 1 in a pharmaceutical composition, he said that you don't necessarily, when you practice the prior art, get just Form 1. A handful of times you've got a mixture. Their experts got a mixture twice our experts once. You get Form 1 and Form 2. And what the district court held was, because you don't necessarily get pure Form 1, that's outside the scope of the claims, because in his view the claims required pure Form 1 and no other crystals, and we think that's incorrect. So his concern rested on an incorrect claim construction. But make two points. One is, as our expert explained without rebuttal, when you get a mixture of two crystals, it's pretty much as basic as it gets to purify out the one you don't want. As basic as you get. And Cephalon admitted that. It's in our brief. Admitted that purification was routine in the pharmaceutical industry. But say you couldn't. Say for some weird reason you couldn't get rid of it. The mixture stayed together and you couldn't get rid of one. It still matches up with the claims. Because what the claim says is that you have to have Form 1 in a pharmaceutical composition and it has to consist essentially of Form 1. Consist essentially of Form 1. And that's just going back to basic. Am I past my time? Yes. I'm sorry. That's okay. Final thought. Final thought. So if it's consisting essentially of, has a well-known meaning, it just means you can't add things that will alter the basic and novel properties. And it's in the record. It's undisputed. You can have a mixture of two crystals and it won't alter Form 1's XRPD pattern. Thank you, Your Honors. All right.